GENELLE WILLIAMS, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Williams v. Commissioner
Docket Nos. 15616-80, 17898-80, 4793-82, 4798-82.
United States Tax Court
T.C. Memo 1985-476; 1985 Tax Ct. Memo LEXIS 157; 50 T.C.M. (CCH) 1029; T.C.M. (RIA) 85476; September 11, 1985. Alan R. Harter, for the petitioners. A. Christopher Zimmerman, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined the following income tax deficiencies and additions to tax: Docket
Addition to Tax
No.
Petitioner
Year
Deficiency
Sec. 6653(a) [2]
15616-80
Genelle Williams
1977
$1,500.00
$75.00
17898-80
Jannessa K. Rogers
1977
2,040.00
102.00
4798-82
Andreas Piyiotis
1978
[3] 3,995.00
199.75
and Ivy Piyiotis
4793-82
Maria Snow
1978
1,319.00
65.95
*158 The issues in these consolidated cases are (1) whether petitioners, four of whom were employed as waitresses and one as a blackjack dealer, understated the amount of "toke" or tip income received by them; and (2) whether petitioners are liable for the negligence addition under section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners were residents of Las Vegas, Nevada, at the time their respective petitions were filed. All of the petitioners, except petitioner Andreas Piyiotis, worked as waitresses at Union Plaza Hotel (Union Plaza) in Las Vegas. Andreas Piyiotis worked as a blackjack dealer at the Holiday Casino also located in Las Vegas. Union Plaza's casino has four pit areas. A pit area in a casino refers to the *159 group of gaming tables involving a certain gambling activity. At Union Plaza, one pit area housed craps tables, and the other three areas had blackjack tables. Several mini-baccarat tables, and two Big Six wheels were located in one of the blackjack pits. Union Plaza had three work shifts; the day shift from 10:00 a.m. to 6:00 p.m.; the swing shift from 6:00 p.m. to 2:00 a.m.; and the graveyard shift from 2:00 a.m. to 10:00 a.m. Cocktail waitresses were assigned a pit area at Union Plaza based upon seniority. They placed bids on available stations. The waitresses in each pit area went from table to table taking drink orders and then serving free drinks to players at the tables. Some players would tip the waitresses with either cash or playing chips. The waitresses did not pool their tips and were allowed to keep whatever tips they received. As a customary practice, the waitresses often gave a certain percentage of their tips to the bartender working with them. In the rear of Union Plaza a coffee shop and a restaurant were located. The restaurant was called the "Key Club" by day and at night it was called the "Backstage." Food waitresses in the restaurant served meals and *160 drinks to customers. The waitresses did not pool their tips and were allowed to keep whatever tips they received. As a customary practice, the waitresses often gave a certain percentage of their tips to the cooks or bartender who worked with them. Waitresses were also required to pay unpaid checks left behind by customers. All of the petitioners herein filed Federal income tax returns for the taxable years at issue. In addition to a salary that was a little above minimum wage, petitioners received income in the form of tips from casino customers. Petitioners reported tip income during the periods involved as follows: Petitioner
Year
Hours Worked
Tip Income
Genelle Williams
1977
1,230  $1,185.00
Jannessa K. Rogers
1977
1,769.5
2,411.00
Andreas Piyiotis
1978
2,056  1,584.00
Ivy Piyiotis
1978
1,763  1,503.00
Maria Snow
1978
2,036  1,203.00
Using a formula developed for this purpose, respondent recomputed tip income for each of the petitioners as follows: Petitioner
Tip Income Recomputed
Genelle Williams
$7,923.00
Jannessa K. Rogers
10,847.00
Andreas Piyiotis
5,140.00
Ivy Piyiotis
11,538.22
Maria Snow
7,860.89
*161 This formula was developed by respondent based upon personal observations made at Union Plaza of tipping practices by customers, conversations with Union Plaza employees, and a general knowledge of the industry. The Tip Project Coordinator, Jill Smith (Smith) testified at trial concerning the development of the formula and its findings.Smith testified that the above factors were utilized to determine that the average tip was $ .50, and that 1 in 2 people tipped, for a 50 percent "stiff" rate. Smith then provided an example of how the per hour tip rate was determined for waitresses on the swing shift in 1977. The 50 percent rate of those who did tip was multiplied by the total number of drinks served in Union Plaza in 1977 on the swing shift, 301,401 [4], to reach a figure of 150,700 for the number of drinks for which a tip was actually received. The $ .50 average tip was then multiplied by 150,700 to reach a gross tip figure of $75,350. This figure was reduced by 2 percent, the amount respondent viewed as paid out by waitresses to bartenders at Union Plaza, to reach a final adjusted tip of $73,843.The final adjusted tip was then divided by the total hours worked by all waitresses *162 on the shift to reach a figure of $7.44 of tips per hour. This figure was reduced by one-eighth to take into consideration any lunch breaks or other breaks taken by the waitresses to reach a final figure of $6.51 of tips earned per hour by each waitress on the shift. This same formula was used to recompute the tips received by all waitresses on all shifts in all areas of the Union Plaza casino. Jannessa Rogers
Petitioner Jannessa Rogers (Rogers) worked as a cocktail waitress at Union Plaza during the day shift. Her pit area contained blackjack tables. Her tables did not open until 12:00 noon. The tables had a bet minimum of $1 in contrast to other pit areas where there were $5, $25, and $100 minimum games. Due to this low minimum the tables were not frequented by serious gamblers but instead by bus tour groups and other individuals who sought to minimize their expenditures. The day shift was not as busy as the swing shift, as evidenced by respondent's study which indicated that drink volume *163 was higher during the swing shift than the day shift. The casino became more active as the day progressed and more people came in to go to dinner or to a show. Rogers also has a permanent disability, severe sciatica, which occurred as a result of her being hit by a truck in July 1977, which interferes with her ability to work. Rogers testified that she had recorded her tips in a diary but had misplaced it after her accident. Rogers stated that based upon her experience respondent's 50 percent stiff rate was too low. She also rejected respondent's contention that the average tip was $ .50 claiming that in her station there was no average tip due to the clientele that frequented her pit on her shift. Genelle Williams
Petitioner Genelle Williams (Williams) also worked as a cocktail waitress in Union Plaza. She worked the swing shift in the same pit area that Rogers worked. Since she worked the swing shift, Williams had more customers than Rogers but her tips still suffered from the same factors that affected Rogers, i.e., the clientele that frequented that particular pit area, and the low minimum bets allowed. Williams also rejected as inaccurate, based upon her *164 experience, respondent's calculation of a 50 percent stiff rate, and a $ .50 average tip. Ivy Piyiotis
Petitioner Ivy Piyiotis (Ms. Piyiotis), also a cocktail waitress at Union Plaza, worked in the baccarat pit from 7:00 p.m. to 3:00 a.m. Ms. Piyiotis testified that baccarat was not a very popular game at Union Plaza and that the game itself was available at Union Plaza because it was enjoyed by the Board of Directors. Ms. Piyiotis also noted that many shills, or employees of Union Plaza, were utilized to initiate play at the baccarat tables. Ms. Piyiotis disputed the figure of 2 percent as the amount she tipped her bartender saying that the figure was too low and should instead be 10%. Ms. Piyiotis testified that she had recorded her tips on a calendar but had misplaced it. Andreas Piyiotis
Petitioner Andreas Piyiotis (Mr. Piyiotis) was not employed at Union Plaza but at the Holiday Casino as a blackjack dealer on the swing shift. No direct study of tipping activity at the Holiday Casino was performed by respondent. Respondent recomputed Mr. Piyiotis' tip income based upon studies made of blackjack dealers in other casinos. Tips were collected from all *165 the dealers at Holiday Casino for a 24 hour period and pooled amongst them equally. Mr. Piyiotis testified that his tips suffered from the fact that most tables in the Holiday Casino allowed minimum bets of $1, and that 1978 was a slow year due to the gas shortage.He also testified that he recorded his tips on a calendar but had misplaced it in moving. Maria K. Snow
Petitioner Maria K. Snow (Snow) was employed as a food waitress at Union Plaza in the Key Club. She stated that business was slow when the Key Club first opened until customers became familiar with it. She testified that she waited on customers only six out of eight hours on her shift since she had to set up tables. She also noted that her station was often frequented by bus tour groups. She recorded her tips daily on a calendar. She testified that she wrote down the amount of money she had when she arrived home and that the totals were correct. However, she acknowledged that sometimes she would stop on the way home to buy groceries or gas. Respondent also presented vouchers that Snow had submitted to Union Plaza which showed the tips she earned on credit card sales. Credit sales represented about 30 *166 percent of total sales in the Key Club. Many of these vouchers (8 of the 20 examples presented by respondent) reflected tips that were higher than the totals recorded by Snow in her calendar for that particular day. Petitioners do not contend that respondent's formula is unreasonable as applied to the average employee at Union Plaza; but they do claim that it is inaccurate as applied to them because of the special circumstances of their working environment, e.g., the lower popularity of games played in their pits, the clientele attracted to the tables in their pits, and the hours they worked. They claim the data upon which the formula is based is inapplicable to them. [5]
Respondent contends that the petitioners understated their tip income and that he is authorized under section 446 to compute the petitioners' taxable income under such method as in his opinion *167 clearly reflects income. Respondent rejects the contention that petitioners' games were unpopular and resulted in low tips, arguing that petitioners had a choice as to the stations they occupied because bids were accepted for the stations based upon seniority. Respondent argues that petitioners would not have remained in the stations if they were as bad as petitioners contend. OPINION It is clear that additional income earned by individuals through tokes or tips is taxable under section 61. (9th Cir.), cert. denied . This fact is not in dispute. The principal issue in this case is whether respondent's formula used to determine understatements of tip income by petitioners is reasonable in this case. If the method utilized by a taxpayer to compute income does not clearly reflect the taxpayer's income, respondent may recompute taxable income using a method which in respondent's opinion does clearly reflect income. . Respondent's determination of petitioners' tip income is presumptively correct and petitioners have the burden of proving *168 it erroneous. ; Rule 142(a). However, adjustments can be made to respondent's determination if it is found that the method or formula used proves inadequate or inaccurate as applied in a particular set of circumstances. . Based upon our examination of the record before us, respondent's formula appears reasonable. We do not find a 50 percent tip rate to be unreasonable nor is a $ .50 average tip unreasonable. We do think that respondent's figures might have been more precise if he had multiplied the average tip rate by the drinks served by a particular waitress, instead of multiplying the total drinks served on a shift by the tip rate. By using the total drinks served, respondent may have inflated the tips received by waitresses who served fewer drinks than the average waitress. This brings us to the thrust of petitioner's argument that respondent's formula is based upon the average, or typical, waitress at Union Plaza and when this formula is applied equally to all waitresses at Union Plaza regardless of the popularity of the pit area it produces unfair results *169 for some. This argument has some merit. While respondent's formula appears reasonable, we believe that an adjustment is necessary to take into consideration the special situations represented by petitioners. However, in making our adjustment, we note that respondent made his determination based upon the information available to him. Petitioners, except for Snow, presented no evidence to assist respondent in his determination. Rogers testified that since she worked the day shift she was not as busy as her counterparts who worked the night shift. [6] She also testified that her pit area is not a very popular one and is frequented by a thrifty clientele. Her testimony is substantiated in part by respondent's study that drink volume was lighter during the day shift than during the swing shift. Rogers is also disabled which affects her ability to work. Based upon these factors, we find that respondent's determination of tip income for Rogers of $10,847 should be reduced to $8,738. *170 Williams does not have as strong a case as Rogers does for adjusting respondent's formula because even though they both work the same pit area, Williams works the swing shift which has more traffic. However, the fact remains that Williams did work in a pit that was less popular and thus less frequented than the average pit. Therefore, we reduce respondent's determination of tip income for Williams from $7,923 to $6,238. Ms. Piyiotis worked in the baccarat pit at Union Plaza. This game was not a very popular one at Union Plaza. Since the game was not very popular, it had fewer players and thus resulted in fewer tips than were received by the average waitress.Based upon these factors, we adjust respondent's determination of tip income for Ms. Piyiotis of $11,538.22 to $8,193. Snow worked as a food waitress on the day shift at the Key Club. The Key Club was a new restaurant at Union Plaza and business was slow when it first opened. Snow's station was often frequented by bus tour groups. In addition, she waited on customers for only six out of eight hours. For these reasons, we think an adjustment should be made in respondent's determination. However, we think that customers *171 are more apt to tip a waitress, and to also tip higher, when they receive a check, as they did in the Key Club, in contrast to when they are just handed a free drink. We also note that Snow's credibility was affected somewhat by evidence that indicated that on 8 of the 20 days respondent examined Snow had recorded erroneous lesser amounts on her calendar of tips earned than her vouchers for tips on credit card sales alone had reflected. Therefore, we adjust respondent's determination of tip income for Snow from $7,860.89 to $7,075. In regard to Mr. Piyiotis, respondent did not make a direct study of the Holiday Casino and its tipping practices but relied upon studies performed in other casinos to recompute Mr. Piyiotis' income. We reduce respondent's determination of $5,140 of tip income for Mr. Piyiotis to $4,251 because the evidence suggests that the Holiday Casino did not attract as many patrons as did the larger casinos in Las Vegas and no direct study was performed of the Holiday Casino. See . We must now address the issue of whether petitioners are liable for the additions to tax under section 6653(a). Section *172 6653(a) provides for an addition to tax where any part of the underpayment is due to negligence or intentional disregard of rules and regulations. Petitioners bear the burden of proving that the addition has been improperly imposed. . Section 6001 and the regulations thereunder clearly require the petitioners to keep adequate records. The record reveals that none of the petitioners kept accurate records with respect to their tip income.The fact that the two petitioners who testified that they had kept records of their tips but lost them may, in our view, militate against them. [7] Accordingly, we sustain respondent's determination under section 6653(a). Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith for purposes of trial, briefing, and opinion: Genelle Williams, docket No. 15616-80; Jannessa K. Rogers, docket No. 17898-80; Andreas Piyiotis and Ivy Piyiotis, docket No. 4798-82; and Maria Snow, docket No. 4793-82.↩
2. All section references are to the Internal Revenue Code of 1954, as amended, and in effect during the taxable years at issue. All rule references are to the Tax Court Rules of Practice and Procedure. ↩
3. Respondent had determined an additional deficiency of $78 for 24 hours that petitioner Ivy Piyiotis had worked at the Omaha Bar. At trial, respondent conceded this issue to avoid confusion.↩
4. In 1977, drink volume was highest on the swing shift with 337,408 drinks served while on the day shift 241,121 were served and on the graveyard shift, 127,158 were served.↩
5. The Court was told at the trial that these petitioners were 5 out of a much larger group of employees of the Union Plaza that were audited in the IRS Union Plaza tip project who did not settle by compromise the deficiencies determined against them by the IRS, because they believed their situations were unique.↩
6. We note that since respondent's formula took drink volume per shift into account an adjustment has already been made to reflect the difference in traffic between the different working shifts.↩
7. The records of the tips received by Snow on credit card sales discredited her testimony and the lost records of Mr. and Mrs. Piyiotis might do the same for them.↩